**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| MARIE JOSEPH<br>2054 CHRIS COURT<br>UNION, KENTUCKY 41091<br><br>  Plaintiff,<br><br>v.<br><br>RONALD JOSEPH<br>1116 LEAFTREE COURT<br>CINCINNATI, OHIO 45208<br><br>  Defendant. | Case No. _____<br><br>Judge _____<br><br>**COMPLAINT, WITH JURY DEMAND** |

For her complaint against the Defendant, Ronald Joseph, Marie Joseph states as follows:

**PARTIES**

1. Plaintiff Marie Joseph ("Marie") is a citizen of Kentucky and resides in Union, Kentucky.

2. Defendant Ronald Joseph ("Ron") is a citizen of Ohio and resides in Cincinnati, Ohio.

3. Ron is Marie's older brother.

4. Marie is a minority shareholder of one or more corporations in which Ron is the majority shareholder or which are under the control of Ron.

**JURISDICTION AND VENUE**

5. There in complete diversity of citizenship between the Plaintiff and Defendant.

6. The amount in controversy exceeds $75,000 exclusive of interest and costs, and this Court has jurisdiction pursuant to 28 U.S.C. §1332(a)(1).

7. Ron is subject to personal jurisdiction in this District.

8. Venue is proper pursuant to 28 U.S.C. §1391 because, among other things, Ron resides in this District and a substantial part of the events giving rise to the claims occurred in this District.

**FACTS**

9. In 1938, George J. Joseph started Columbia Oldsmobile Company, an Ohio corporation formerly known as Columbia Motor Sales Co. ("Columbia"). George owned and operated Columbia until his death in 1966. Since his death, Defendant Ron, the oldest of seven children of George J. Joseph and Najla Joseph, has served as the Chief Executive Officer of Columbia.

10. From 1938 until his death in 1966, George J. Joseph's business was selling automobiles and acquiring real estate. After the death of George J. Joseph, Columbia and Ron have been in the same businesses—owning and operating car dealerships, and owning, acquiring and renting real estate.

11. All seven of George J. Joseph's children (the "Seven Children"), including Marie and Ron, are shareholders of Columbia.

12. George J. Joseph ("George") executed a Will, which included a Testamentary Trust, in 1953. During his life, he gifted shares of stock to his seven children. When George died, his wife Najla inherited 855 shares of Columbia, 273 "A" (voting) shares and 582 "B" (non-voting shares).

13. The balance of George's interest in Columbia, 255.1 "A" shares, was placed in the George Joseph Testamentary Trust (the "GJ Trust").

14. George desired for the GJ Trust to pay 75% of the income/distributions from the trust's 255.1 "A" shares to Najla during her life, with the balance of the income payable to the Seven Children equally.

15. Najla never worked as an employee of Columbia or any other entity.

## NAJLA'S ESTATE PLAN

16. In 1992, Najla made her Will and Trust.

17. Najla's intended to disinherit Ron from her interest in Columbia and leave her 273 "A" shares and 582 "B" shares to Marie, Renee, Teresa, Shirley, Robert, and Michael, *equally*.

18. In addition to the Columbia shares these six of the Seven Children already owned (through gifts), Najla's Estate Plan would have made her seven children essentially equal owners of the family auto dealerships, since Ron had a right to buy a portion of the stock in the GJ Trust that he controlled as trustee.

19. Knowing that he had been disinherited, Ron, while the chief officer of Columbia, and without Marie's knowledge, implemented a plan to: (i) usurp Columbia's corporate opportunities; and (ii) strategically create a financial crisis for Najla's future estate (and control Najla's spending during her life), in order to obtain her shares.

20. Ron's usurpation of corporate opportunities is discussed below. To manufacture a strategic financial crisis, Ron prevented Columbia from paying effectively any significant income or profit distribution to Najla for ten plus years.

21. Thus, even though she was the majority owner of one of Cincinnati's largest auto dealer empires, Najla received little to no benefit from her ownership, and was required by Ron to effectively live without funds while, upon information and belief, many millions of dollars in gross revenue were being generated in Columbia.

22. Ron's secret plan caused Najla to have to borrow money from U.S. Bank just to live.

23. In addition, any money that Columbia did provide to Najla to meet her basic living needs was characterized by Ron as a loan from Columbia, which Ron required Najla, his mother, to repay.

24. This scheme caused Najla to transfer to Columbia at least 17% of her "A" shares. Specifically, in 2005 and 2006 – while Ron held a Power of Attorney that he had secretly secured from Najla – Ron required Najla to give 35 "A" shares back to Columbia to pay off an alleged "loan."

25. Ron's strategy kept Najla cash poor, reduced the number of shares that Ron's siblings could inherit from Najla, and also increased Ron's ownership percentage of Columbia.

26. As the result of Ron's intentional actions, despite Najla having been the majority owner of Columbia for decades with the ability to fulfill the expectancy of her remaining six children that they would inherit all of Najla's shares in Columbia, Najla died owning only: (a) the modest, dated family home and its contents, (b) non-liquid, insignificant investments, (c) 672 shares of Columbia, and (d) some personal effects.

27. Najla's interest in Columbia, as a result of Ron's plan, brought Najla any benefit during her life. Rather, Najla's death resulted in a $4,000,000 tax bill that the Estate could not pay. Ron took advantage of this estate tax crisis that he created to purchase (at a depressed, non-market price) the Columbia stock that Najla intended to pass to her children other than Ron. The implementation of Ron's plan also had the intended effect of depriving his siblings of a reasonable certainty that their expectancy of inheritance of all of Najla's shares would have been realized but for Ron's conduct.

28. To "rescue" the estate from the crisis he created, Ron took all of Najla's "A" shares and approximately 20% of the estate's "B" shares so that his siblings would not receive any additional voting rights in Columbia.

29. Given the cash position that Ron had put the estate in, the estate sold all of Najla's 128 "A" shares to Ron plus approximately 95 "B" shares.

30. For decades, Ron exercised his authority over his siblings, including Marie and a brother with Down's Syndrome.

31. For years, Ron led Marie to believe that the amounts of money he distributed were fair and proper.

32. When Marie asked questions of Ron about the business, Ron frequently exhibited extreme anger, and both he and corporate counsel admonished Marie and questioned her family loyalty.

33. As the executive officer of a family business, Ron exercised authority over his siblings, including Marie, and completely controlled what information would be distributed to Marie.

34. Further, Ron did not believe that women should have any role in the company, and reinforced the concept that Ron – as the eldest son of their father -- should be respected and trusted by his sisters, including Marie, without further inquiry.

35. On numerous occasions, Ron threatened Marie, in an apparent effort to dissuade her from seeking information about Columbia's operations and from seeking to exercise her rights as a minority shareholder.

36. Ever since the death of his father George, Ron has had, and continues to exercise, *de facto* control of Columbia and its affairs.

37. Through Ron's ownership and ongoing acquisition of shares, including but not limited to ownership of a majority of the "A" shares, Ron has also become the majority shareholder of Columbia.

38. Columbia is a closely held family corporation.

39. In the circumstances presented, Ron's relationship to Marie is one of trust, confidence and loyalty.

40. At all times subsequent to the death of their father George, Ron owed fiduciary duties to Marie.

41. At all times subsequent to the death of their father George, Ron has owed heightened fiduciary duties to Marie.

42. By his conduct, Ron has violated his fiduciary duties to Marie.

43. Ron has manipulated his control over the close corporation in order to unfairly acquire personal benefits owing to or not otherwise available to Marie as a minority shareholder of Columbia.

44. Through his control of the close corporation, Ron has had the power to oppress Marie as a minority shareholder of Columbia, and continues to have that power.

45. Ron has oppressed Marie as a minority shareholder of Columbia and continues to do so.

46. Ron has violated his fiduciary duties to Marie on numerous occasions and in numerous schemes.

47. Ron's conduct, including but not limited to his breaches of fiduciary duties and his oppression of Marie as a minority shareholder, has caused injury to Marie in a way that is separate and distinct from an injury to the corporation.

## STOCK IN COLUMBIA

48. As indicated above, Columbia was established for two purposes: own auto dealerships (with captive insurance and financing companies); and acquire and hold income producing real estate.

49. Prior to filing this lawsuit, Marie (through counsel) requested that Columbia produce its shareholder records, but Ron refused to allow them to be produced. Accordingly, below is an identification of Columbia ownership at material points in time based on Marie's best information and belief.

50. On January 1, 1967:

- Najla owned **273 A** and **582 B** shares of Columbia;
- The GJ Trust held **255.1 A** shares of Columbia; and
- The Seven Children owned a nominal number of "A" and/or "B" shares.

51. Over time, Najla made gifts to her Seven Children, and all of Robert's shares were acquired by Ron. Therefore, as of January 1, 2000, Columbia stock was held as follows:

| **Name** | **A Shares** | **B Shares** | **Total %** |
|---|---|---|---|
| Najla | 208 | 590 | 46.637% |
| GJ Trust, Ron T'ee | 255.1 | 0 | 14.91% |
| Ron[1] | 180.856 | 40 | 12.91% |
| Renee | 32.429 | 74 | 6.22% |
| Shirley | 28.429 | 78 | 6.22% |
| Teresa | 20.429 | 62 | 4.82% |
| Marie | 24.429 | 50 | 4.35% |
| Michael - Najla Guardian | 46.428 | 21 | 3.94% |
| Robert | 0 | 0 | 0% |

---

[1] Ron purportedly caused his sons to come to own 32 shares of Columbia. Those shares and any shares "owned" by Ron's spouse or companies Ron controls are included in "Ron's" total throughout this Complaint.

7

52. Although the GJ Trust gave Michael, Robert, and Ron equal right to buy the shares of Columbia held in trust, Ron took all 255.1 "A" shares resulting in share ownership as follows at the end of 2004:

| Name | A Shares | B Shares | Total % |
|---|---|---|---|
| Najla | 208 | 590 | 46.637% |
| Ron | 435.956 | 40 | 27.82% |
| Renee | 32.429 | 74 | 6.22% |
| Shirley | 28.429 | 78 | 6.22% |
| Teresa | 20.429 | 62 | 4.82% |
| Marie | 24.429 | 50 | 4.35% |
| Michael - Najla Guardian | 46.428 | 21 | 3.94% |
| Robert | 0 | 0 | 0% |

53. As indicated above, in 2005-2006, through Najla's secret POA, Ron took 35 "A" shares from Najla to pay what Ron called a loan that Najla took from Columbia. And between 2008 and 2011, Ron (with the secret POA) gifted shares of Najla's stock to himself and his siblings. That left the Columbia share breakdown as follows when Najla died:

| Name | A Shares | B Shares | Total % |
|---|---|---|---|
| Najla's Estate | 128 | 544 | 41.073% |
| Ron | 450.956 | 44 | 30.254% |
| Renee | 32.428 | 80 | 6.872% |
| Shirley | 28.429 | 84 | 6.872% |
| Teresa | 20.429 | 68 | 5.405% |
| Marie | 24.429 | 56 | 4.916% |
| Michael - Najla Guardian | 46.429 | 25 | 4.366% |
| Robert | 0 | 4 | 0.244% |

54. In July 2014, Najla's cash poor estate sold all 128 "A" shares (@ $17,885/share) and 95 "B" shares (@ $16,991/share) to Ron to generate $4,000,000 to pay estate taxes.

55. Ron would only enter into that transaction if he received all of Najla's "A" shares. The estate, however, held more than $4,000,000 in "B" shares, which could have been sold to pay tax and preserve the voting rights that Najla had long intended to keep from Ron and bequeath to Marie, Renee, Shirley, Teresa, Robert, and Michael.

8

56. Ron did all of these things without disclosing the truth to Marie about how he wrongfully obtained Najla's shares.

57. Through the foregoing conduct, Ron further enhanced his control over Columbia.

**USURPATION OF CORPORATE OPPORTUNITIES: DEALERSHIPS**

58. In 1967, after his father died, Ron was a small, minority shareholder of Columbia.

59. Ron was trusted to serve the family and shareholders as Columbia's chief officer from 1967-2016. During that entire time, he owed fiduciary duties to Marie.

60. In 1990, Columbia opened Columbia Hyundai and Columbia Acura. Those two dealerships would be the last dealerships that Ron would allow to be added to Columbia.

61. In 1992, Ron learned that Najla had disinherited him from receiving any of Najla's 800+ shares of Columbia. Therefore, after that date, in breach of his fiduciary duties to Marie, Ron usurped all opportunities for Columbia to acquire any new, additional dealerships.

62. Instead, Ron knowingly and intentionally took all of those opportunities for himself or members of his immediate family.

63. Ron usurped or misappropriated these opportunities without disclosing appropriate information to Marie and without offering Marie an opportunity to participate in the benefits of those corporate auto dealership business opportunities.

64. By his conduct, Ron has personally and wrongfully benefitted from those transactions.

65. Ron's self-dealing and usurpation of corporate opportunities of Columbia in relation to automotive dealerships without appropriate disclosures to Marie wrongfully benefitted him and caused harm to Marie as a minority shareholder of Columbia.

## USURPATION OF CORPORATE OPPORTUNITIES: REAL ESTATE

66. For decades, Columbia has also owned income producing real estate. Prior to 1992, Columbia came to own:

- 250 E. Fifth Street, constituting the land under the "Chiquita Center," which generates $500,000 - $1,000,000 in annual rent; and

- 406 parking spaces (lots located at 415 Court St. across from the Casino; 7th & Sycamore; and 9th and Sycamore).

67. Since learning in 1992 that he would be disinherited, Ron usurped all real estate opportunities that should have come to Columbia.

68. Instead of acquiring dealership real estate and other real properties within Columbia, upon information and belief Ron has acquired dealership real estate and other income producing real property in companies he or members of his immediate family claim to control or own.

69. Ron did so without disclosing appropriate information to Marie and without offering Marie an opportunity to participate in the benefits of those real estate business opportunities.

70. By his conduct, Ron has personally and wrongfully benefitted from those transactions.

71. Ron's self-dealing, usurpation and misappropriation of corporate opportunities of Columbia relating to real estate investments without appropriate disclosures to Marie wrongfully benefitted him and caused harm to Marie as a minority shareholder of Columbia.

**RECORDS REQUEST**

72. As a minority shareholder of Columbia, Marie made a written request for the opportunity to examine Columbia's books and records as unequivocally allowed by law, R.C. § 1701 *et seq*.

73. Exercising his control over Columbia, Ron refused to allow Columbia to release *any* records or information to Marie.

**COUNT ONE**
**(Breaches of Fiduciary Duties)**

74. Marie incorporates by reference all of the foregoing allegations as if fully set forth herein.

75. By his conduct as described above, Ron has breached his fiduciary duties to Marie.

76. Ron's breaches of fiduciary duties have caused damage to Marie.

77. Ron is liable to Marie for all damages caused by Ron's breaches of fiduciary duties.

78. Ron should be ordered to disgorge to Marie all benefits that he has received as a result of his breaches of fiduciary duties.

79. Ron should be required to pay prejudgment interest to Marie.

80. Ron's breaches of fiduciary duties to Marie have been knowing, intentional and willful, and Marie is also entitled to punitive damages as a result of his conduct.

**COUNT TWO**
**(Access to Corporate Records)**

81. Marie incorporates by reference all of the foregoing allegations as if fully set forth herein.

82. Despite Marie's requests, Ron has refused to provide access to the books and records of Columbia, in violation of Ron's duties to Marie as a minority shareholder.

83. Ron should be ordered to permit Marie to inspect and copy the books and records of Columbia.

## COUNTY THREE
### (Accounting)

84. Marie incorporates by reference all of the foregoing allegations as if fully set forth herein.

85. Ron has had, and continues to have, fiduciary duties to Marie.

86. As a result of Ron's conduct as described above, Ron has received profits or assets that Marie is entitled to share.

87. Marie is entitled to an accounting of all Ron's assets constituting, relating to or arising out of automobile dealerships or real estate investments.

88. Ron should be ordered to provide such an accounting.

WHEREFORE, Plaintiff demands judgment against Defendant Ronald Joseph as follows:

A. Compensatory damages for all harm to Plaintiff resulting from Defendant's breaches of fiduciary duties, in an amount to be proven at trial;

B. For disgorgement to Marie of all benefits that Defendant Ronald Joseph has received as a result of his breaches of fiduciary duties;

C. For equitable relief, requiring that Defendant Ronald Joseph permit Plaintiff to inspect and copy the books and records of Columbia;

D. For equitable relief, requiring that Defendant Ronald Joseph provide an accounting of all Defendant's assets constituting, relating to or arising out of automobile dealerships and real estate investments;

E. For prejudgment interest, costs and attorneys fees;

F. For punitive damages;

G. For trial by jury on all issues so triable; and

H. For any other and further relief to which she may be entitled at law or in equity.

Respectfully submitted,

_____
Kevin L. Murphy (#0021810)
KEVIN L. MURPHY PLLC
2400 Chamber Center Drive, Suite 212
P.O. Box 17534
Fort Mitchell, KY 41017-0534
Telephone: (859) 578-3060
Fax: (859) 578-3061
klmurphy@kevinlmurphylaw.com
*Counsel for Plaintiff*