# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | |
|---|---|
| MARIE JOSEPH | Case No. 1:16-cv-00465-TSB |
| Plaintiff, | Judge Timothy S. Black |
| v. | |
| RONALD JOSEPH, *et al.* | **MEMORANDUM IN OPPOSITION TO DEFENDANTS' JOINT OMNIBUS MOTION IN LIMINE** |
| Defendants. | |

Plaintiff Marie Joseph, through counsel, respectfully submits the following Memorandum in Opposition to Defendants' Joint Omnibus Motion in Limine (her "Response"). Defendants' Joint Omnibus Motion in Limine ("Ron's Motions")[1] contains 11 separate motions *in limine* covering a variety of issues. Plaintiff will address each motion *in limine* in turn.

**I.  Ron's Motion *in Limine* Regarding "Plaintiff's July 2018 Theory Regarding Columbia's AFG Stock"**

   A. *Contrary to Ron's assertions, American Financial Group stock <u>was</u> transferred from Columbia to Ron.*

Ron's first Motion relates to what Defendants' have characterized as "Plaintiff's July 2018 Theory Regarding Columbia's AFG Stock." Ron contends that Plaintiff's "new theory" is not "supported by any facts or evidence," and that "[t]he alleged transfers simply never occurred." Doc. No. 152, PAGEID 11028. Both of those contentions are false.

In a series of transactions that are completely ignored by Ron in his Motion, Columbia purchased 1,000 shares of American Financial Group ("AFG") stock on November 15, 2013, and

---

[1] Subsequent to the parties filing their motions *in limine* on August 22, 2018, the Court ruled on the parties' motions for summary judgment. *See* Doc. Nos. 118, 119 and 120. The Court granted the Additional Defendants' motion for summary judgment (*see* Doc. No. 118), leaving Ron as the only remaining defendant in this case. Thus, though the motion was originally titled "Defendants' Joint Omnibus Motion in Limine," Plaintiff will refer to those motions as "Ron's Motions" for purposes of this responsive memorandum.

purchased another 1,000 shares over three separate transactions on November 18, 2013. *See* Ex. A. Then, on December 18, 2013, the 2,000 AFG shares purchased in November of 2013 were sold by Columbia for the exact price for which they were originally purchased. *Id.* Columbia's "general ledger" is devoid of any evidence as to who purchased those AFG shares from Columbia.

A separate document produced by Ron, however, indicates that the AFG shares sold in December 2013 were sold to Ron. RJ 160872, attached hereto as Exhibit B, is a Columbia Development Corporation check request regarding a check written by Columbia to Ron. Its explanation reads as follows: "AFG Stocks for UBS Account – on 12-18-1[3]$^2$ the stocks were cancelled from Columbia & transferred to Mr. Joseph. (2000). But when dividends were paid, the 2000 was paid to Columbia – not Mr. Joseph – (a date issue)."

That document provides the details of Ron's self-dealing transaction. On December 18, 2013, Columbia transferred 2,000 shares of AFG stock, and Columbia transferred those shares to Ron.$^3$ Furthermore, it evidences that the dividends from those AFG shares were paid to Ron. Thus, Plaintiff's July 2018 Supplemental Interrogatory Answer identifying that Ron "caused American Financial Group stock owned by Columbia and dividends issued in relation to that stock to be transferred to the defendants or entities they purport to own or control" is not a "theory"— those transactions occurred, as demonstrated by the evidence in the record.

Rather than address the November and December 2013 transactions involving the AFG stock, Ron instead focuses on a series of dividend payments from December 2010 through January 2016 before asserting in conclusory fashion that "[t]here has never been a sale or transfer of AFG

---

$^2$ The document literally reads "12-18-14." However, the transactions referenced in that document show that the date referenced there is actually December 18, 2013. Furthermore, the check request itself is dated January 10, 2014.
$^3$ Of course, only Ron could have authorized the transfer of the AFG stock to himself. Moreover, his son Gregory Joseph was (and still is) on the board of directors of American Financial Group, Inc.

2

stock." Doc. No. 152, PAGEID 11028. The documents discussed above demonstrate that assertion to be false.[4] Columbia transferred the 2,000 AFG shares to Ron in December of 2013, as Ron's own documents show. That transaction was not properly authorized or disclosed. The limited transactions regarding AFG stock that Ron *does* discuss are not the basis of Plaintiff's claims in relation to AFG stock, and the transactions identified by Ron do not provide a sufficient basis for excluding evidence of the November 2013 and December 2013 transactions of AFG shares and dividends to Ron.

> B. *The timing of Plaintiff's July 2018 Supplemental Interrogatory Answer identifying the transfer of AFG stock to Ron is proper because it was justified and harmless.*

Ron also contends in his Motion that Plaintiff's July 2018 Supplemental Interrogatory Answer is untimely and should thus be excluded under Fed. R. Civ. P. 37. Doc. No. 152, PAGEID 11029. Ron correctly notes that a late disclosure of information will not be a basis for excluding that information if the late disclosure was "substantially justified or harmless." *Id*. As discussed below, the timing of Plaintiff's disclosure of this information is both substantially justified and harmless.

The information relating to the transfer of the AFG stock identified in Plaintiff's July 2018 Supplemental Interrogatory Answer is buried in Columbia Development's "general ledger." The Columbia Development "general ledger" produced by Ron is not a "general ledger" at all—it is merely an Excel spreadsheet over 1,000 pages long that purportedly evidences the individual

---

[4] The evidence supporting Ron's assertions that no sale or transfer of AFG stock occurred is a declaration by Melinda Nau and a handwritten "Records of Stocks and Bonds" sheets pertaining to Columbia's ownership of AFG stock. *See* Doc. No. 152-1, PAGEID 11047-11050. There are at least two significant issues with these documents. First, Ms. Nau's assertion in her sworn declaration that "[t]here has never been any sale or transfer of AFG stock" is simply incorrect, as demonstrated by the evidence discussed above. Second, the handwritten document attached to Melinda Nau's declaration has never been produced by Ron or the Additional Defendants. The Court should thus strike it from the record. Regardless of whether it had been produced by Ron or not, however, it does nothing to demonstrate that the transfers of AFG stock discussed herein did not actually occur, as Ron and Ms. Nau contend.

general ledger entries that are entered and maintained on a computer program called Peachtree. The format in which the "general ledger" is displayed, as produced by Ron, bears no resemblance to the format in which that information appears when viewed in the Peachtree program (*compare* Ex. A with Ex. C) and does not offer any of the functionality the Peachtree program likely provides in its native format, including the ability to look at the "source documents" that back up individual transactions. If Plaintiff had access to the information as it is displayed in the Peachtree program and/or she had the benefit of Peachtree's functionality, perhaps she would have unscrambled the egg and discovered this transaction sooner. Ron, however, has continual and unlimited access to **all** of that information and, both as President of the transferor of the AFG stock (Columbia) and as the recipient of that stock, Ron has had this information all along.

Moreover, though Ron was asked to produce all documents relating to any related party transactions (*see* Plaintiff's Third Set of Requests for Documents, attached hereto as Ex. D), Ron produced very limited information on this transaction. Ron did not produce any of the stock certificates that were transferred from Columbia to himself individually. Nor did he produce the document attached to Melinda Nau's declaration, which itself indicates (but does not explain why) the shares purchased in November 2013 were allegedly "cancelled." *See* Doc. No. 152-1, PAGEID 11049.

Ron should not be permitted to withhold or otherwise fail to produce relevant, responsive documents and then use the absence of those documents and information against Plaintiff. Ron had the information about these undisclosed self-dealing transactions all along. Plaintiff ultimately discovered the transactions despite the very limited information produced by Defendants in discovery. Ron's Motion should thus be denied because the evidence in the record shows that they occurred, Ron had the underlying information all along, and Plaintiff's disclosure that she had

4

figured out what Ron already knew was both substantially justified and harmless.

## II. Ron's Motion *in Limine* Regarding the "Bare Legal Conclusions from Plaintiff's Experts"

Ron's second Motion seeks to exclude the opinions of two of Plaintiff's expert witnesses, Geoffrey Stern and Paul Hess. Ron's Motion on this issue can be broken down into two arguments: (i) that Mr. Stern and Mr. Hess improperly assert mere legal conclusions that are inadmissible at trial, and (ii) that Mr. Stern and Mr. Hess purportedly do not "know or determine any of the facts at issue in this case." Doc. No. 152, PAGEID 11030-11032. For the reasons discussed below, these arguments are unavailing, and Ron's Motion on this issue should also be denied.

### A. *The expert opinions of Mr. Stern and Mr. Hess are proper and admissible.*

In his Motion, Ron characterizes the opinions of Mr. Stern and Mr. Hess (the "Expert Opinions") as being mere legal conclusions and then asserts that they must therefore be inadmissible. Plaintiff acknowledges that in some circumstances "legal conclusions" are not admissible as expert testimony under the Federal Rules of Evidence. It is important to define the term "legal conclusion" in order to determine the admissibility of expert testimony, however, and Ron fails to do so in his Response.

In *Woods v. Leceureux*, 110 F.3d 1215, 1220 (6th Cir. 1997) (a case cited by Ron), the Sixth Circuit states that "a legal conclusion—***i.e., testimony that does little more than tell the jury what result to reach***—is properly excludable under the Rules" (emphasis added). Ron omits the *Woods* court's definition of "legal conclusion" and instead asserts in conclusory fashion that the Expert Opinions *are* legal conclusions (despite never defining the term) and thus must be excluded.

Ron is incorrect. Mr. Stern and Mr. Hess analyzed a set of assumed facts—which, as discussed below, are supported by the evidence in the record and the evidence to be put on by Plaintiff at trial—and opined, on the basis of their experience and expertise, as to whether the

5

actions described in those assumed facts constituted a breach of an attorney's ethical duties (in the case of Mr. Stern) or a breach of one's fiduciary duties (in the case of Mr. Hess). These are not opinions "that do little more than tell the jury what result to reach," and they are thus not legal conclusions. *Woods*, 110 F.3d at 1220. Moreover, as the Sixth Circuit noted in *Shahid v. City of Detroit*, "Federal Rule of Evidence 704 permits a witness to testify in the form of an opinion or inference to an 'ultimate issue to be decided by the trier of fact.' However, '[i]t is not for the witness to instruct the jury as to applicable principles of law, but for the judge.'" The Expert Opinions do not instruct the jury as to applicable principles of law—they instead serve the purpose of assisting the jury in determining the ultimate issue of whether Ron breached the duties he owed to Plaintiff. For this reason, Ron's Motion regarding the Expert Opinions should be denied.

Moreover, "where the 'ultimate issues of fact' in a case track closely with 'legal conclusions,' an expert's opinion may often be rendered admissible or inadmissible by a mere change in phrasing." *Sierra v. Williamson*, No. 4:10-CV-0079-TBR, 2013 WL 228333, at *7 (W.D. Ky. Jan. 22, 2013) (internal citations omitted). The *Sierra* court was faced with an issue similar to the one raised by Ron in his Motion: the plaintiff had proffered the opinions of two expert witnesses, with both expert reports containing a "summary" section concluding that the defendant breached certain fiduciary duties. *Id.*, *7-*8. Ultimately, the Court concluded that "the admissibility of [the experts'] opinions would largely turn on the phrasing of the questions posed to [them] and the responses given." *Id*. The *Sierra* court then denied the motion to exclude that testimony until the experts were deposed, which would allow the court to better determine whether the expert truly offered "opinions in the form of inadmissible legal conclusions." *Id*.

Ron never took the depositions of Mr. Stern or Mr. Hess. He does not have any evidence in his Motion or otherwise that those experts' testimony at trial will take the form of an

6

inadmissible "legal conclusion." This is thus an independently sufficient basis for denying Ron's Motion, as the Court will be better able to assure at trial that the questions and the testimony of Mr. Stern and Mr. Hess will ultimately be limited to the proper form. Ron's request that the Court assume that the experts will be asked to testify as to the purely legal conclusions, and to exclude their testimony based on that inaccurate assumption, should not be granted.

> B. *Plaintiff intends to elicit testimony and put forth evidence that will support the facts assumed by Mr. Stern and Mr. Hess.*

Ron also contends in his Motion that the Expert Opinions are excludable because they rely on assumed facts. But the reliance of an expert witness on assumed facts in rendering his opinion is a method permitted by federal courts so long as there is "some support for those assumptions in the record." *United States v. L.E. Cooke Co.,* 991 F.2d 336, 342 (6th Cir.1993). *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800–01 (6th Cir. 2000); *see also United States v. Collins*, 78 F.3d 1021, 1037 (6th Cir. 1996) (allowing an expert to be questioned on the basis of assumed "hypothetical facts" when those hypothetical facts "were consistent with the proofs the government had presented" and the expert witness explained legal implications of the actions the defendant had undertaken). Moreover, "an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert v. Merrell Dow Pharm.,* Inc., 509 U.S. 579, 592 (1993).

There is ample evidence in the record to support the facts assumed by Mr. Stern and Mr. Hess, including exhibits and testimony submitted to the Court by Plaintiff in conjunction with her summary judgment briefing. The evidence supporting the assumed facts will be further demonstrated by Plaintiff at trial. Ron's argument for excluding the Expert Opinions on this ground fails, and his Motion on this issue should be denied, allowing the Court to rule on these issues, if they arise at all, in the context of trial.

**III.     Ron's Motion *in Limine* Regarding Michael D. Costello**

Plaintiff does not oppose Ron's Motion seeking to limit Plaintiff's expert Michael D. Costello to those opinions disclosed in his expert report and further discussed in his deposition.

**IV.     Motion *in Limine* Regarding the 2008 Audio Recording of Ronald Joseph**

Ron's next Motion relates to a 2008 recording of a conversation between Plaintiff and Ron that Plaintiff produced on September 8, 2016 as MAR003841 (the "Tape"). Ron's Motion contains so many mischaracterizations of the Tape and its substance that it is difficult to address all of them individually. Ron's gratuitous comments in the Motion smearing Plaintiff and her character should not distract the Court from appreciating the Tape's substantial relevance and probative value.

While Ron attempts to characterize this litigation as a "case [that] involves the business dealings of the Defendants related to Columbia since 2012," that self-serving description does not accurately describe the nature of this case. This case is about Ron using control of Columbia, as both a majority and controlling shareholder, to oppress Plaintiff, a minority shareholder of that company. In light of the true nature of Ron's actions and Plaintiff's claims regarding his numerous breaches of fiduciary duties, the Tape that Ron seeks to exclude is neither irrelevant nor prejudicial.

Ron's statements on the Tape evidence things such as the intent and motive behind oppressing Plaintiff as a minority shareholder. Many of those same statements also directly contradict Ron's litigation theories as to why Plaintiff is not receiving the same money and other things of value from Columbia that Ron and his sons receive. For these reasons, the statements made on the Tape are highly relevant and the Tape's probative value outweighs any purported prejudicial effect it may have.

Even if the Court were inclined to agree with Ron's contentions that the Tape is inadmissible under Fed. R. Evid. 401 and 403, the Court should *still* not grant Ron's Motion

8

regarding the Tape. "Generally, [m]otions *in limine* are . . . used to . . . eliminat[e] evidence that is ***clearly inadmissible for any purpose***." *Storrs v. Univ. of Cincinnati*, No. 1:15-CV-136, 2018 WL 684759, at *1 (S.D. Ohio Feb. 2, 2018) (Black, J.) (citing *Indiana Ins. Co. v. Gen. Elec. Co.*, 326 F.Supp.2d 844, 846 (N.D. Ohio 2004) (emphasis added). In addition to its relevance, the Tape may also be admissible for purposes of impeachment if Ron offers testimony at trial that contradicts any of the statements he makes during the conversation on the Tape. Since the Tape is admissible for the reasons discussed above, Ron's Motion regarding the Tape should be denied.

**V.     Motion *in Limine* Regarding "Certain Emails Discussing Non-Columbia Dealerships"**

In his next Motion, Ron seeks to exclude two separate sets of emails, one containing a conversation in July 2011 and the other containing a discussion that took place in March 2013. For the reasons discussed below, Ron's Motion regarding those emails should also be denied.

**A.     July 2011 Emails**

The first group of emails Ron identifies in his Motion occurred on July 6, 2011 between each of the Additional Defendants[5] (the "July 2011 Emails"). In short, these emails focus on a plan hatched (at least in part) by Ron's sons to have all "profitable dealerships that [they] own 20% in begin to pay management fees of 1000 dollars each month to each brother." Doc. No. 152, PAGEID 11037. Ron then requests that these emails be excluded because the Additional Defendants collectively own less than 1% of Columbia and because the "proposal" discussed in those emails relates to dealerships in which the Additional Defendants had 20% ownership interest—thus, Ron argues, any discussion of these emails would purportedly "be misleading and

---

[5] Following the filing of the parties' motions *in limine*, the Court ruled on the parties' motions for summary judgment. The Additional Defendants' motion for summary judgment was granted, and they have since communicated to the Court and the parties that they will be voluntarily dismissing the counterclaim they filed against Plaintiff. They are thus no longer parties to this case. For continuity and ease of reference, however, Plaintiff will still refer to them at times as the "Additional Defendants."

9

unfair." Given the nature and scope of the transactions at issue in this case, however, the July 2011 Emails are highly relevant and have significant probative value.

The July 2011 Emails evidence a plan on the part of Ron's sons (which, as discussed below, was eventually implemented with the substantial assistance of their father) to take money from dealerships in the Joseph Auto Group via transactions labeled by Ron and his sons as "management fees" to be paid to Pond Realty Company, a company owned by Ron's four sons and of which Ron is president and one of only two employees. The documents and testimony in the record demonstrate that the plan was ultimately put into place for two of Columbia's dealerships, Columbia Acura and Columbia Hyundai, which pay hundreds of thousands of dollars a year in so-called "management fees" to Pond Realty Company. That Ron's sons at first contemplated this plan for "dealerships they own 20% in" does not negate the fact that the plan was ultimately put into action with two other Columbia dealerships as well. As Ron Joseph, Jr. testified in his deposition, management fees were calculated in part on a dealership's profitability, just as these emails show. *See* Ron Joseph, Jr. Dep., 26:8-18, attached hereto as Ex. E.

Ron also argues that the July 2011 Emails are irrelevant because they occurred before the statute of limitations date of April 12, 2012. Just because those emails planning the conduct took place before April 12, 2012 does not render them irrelevant to conduct that was implemented on and after April 12, 2012. The July 2011 Emails describe a plan to take money from Columbia in the form of so-called "management fees" that has been in place since *at least* April 12, 2012, and that continues to this very day. The related proof establishing the subsequent implementation and continuity of the very conduct described by Ron's sons in the July 2011 Emails in the period after April 12, 2012 demonstrates the relevance of those communications and warrants a denial of Ron's Motion as it relates to the July 2011 Emails. Ron simply wants the Court to exclude anything that

10

is harmful to him. Unfortunately for Ron, that is not a sufficient basis for a motion *in limine*, and Ron's Motion regarding the July 2011 Emails must thus be denied.

B. *March 2013 Emails*

Ron's characterizations and arguments regarding the March 9-14, 2013 emails attached to Ron's Motion as Exhibit F (the "March 2013 Emails") are even more puzzling. After quoting various portions of the March 2013 emails—including the portion wherein George Joseph ("George") states that Ron's sons "can have ***dealerships funnel money*** somewhere like swap or pond . . ." (emphasis added)—Ron somehow concludes that the emails are not about Columbia but "about other dealerships and investments owned by Additional Defendants." Doc. No. 152, PAGEID 11039. Ron offers no basis for his claim that the emails are not about Columbia or the dealerships that Ron acknowledges that Columbia owns (Columbia Acura and Columbia Hyundai). George's email states that Ron's sons "can have ***dealerships*** funnel money. . ." There is no limitation on "dealerships" as George used it in that sentence, and nowhere in any of the other March 2013 Emails do Ron's sons specify or otherwise state that their plan to "funnel money" from "dealerships" somehow excluded funneling money from Columbia's Acura and Hyundai dealerships.[6]

Ron likewise asserts that his Motion should be granted because "[u]nsophisticated jurors could easily miss the distinction between Defendants' ability to take money out of dealerships they 100% own and other dealerships like Columbia in which Defendants do not hold 100% ownership." *Id*. As the proof at trial will show, the Defendants' "100%" owned dealerships

---

[6] Ron's assertion that the March 2013 Emails "are not talking about Columbia, but about other dealerships and investments owned by Additional Defendants" not only lacks a factual basis, it is actually belied by those communications themselves. In the first email contained in the March 2013 Emails, Ronald Joseph, Jr. requests an "all things board meeting" to discuss, among other things, the Denison property and the casino parking lot, two properties that are indisputably owned by *Columbia* and not separately by the Additional Defendants.

11

actually function as subsidiaries of Columbia, just as Columbia Acura and Columbia Hyundai do. Therefore, the Motion is predicated on an inaccurate *a priori* assumption that the jurors will agree with Ron on the Joseph Auto Group "issues." Furthermore, that jurors could "miss" the purported "distinction" between Columbia Acura, Columbia Hyundai has nothing to do with their level of sophistication and has much more to do with the fact that such a "distinction" is not made *in* the March 2013 Emails but was merely created by Ron as an assertion *about* the March 2013 Emails for purposes of his Motion. Once again, there is no basis—facially or in the record—for Ron's position that the March 2013 Emails relate only to dealerships Ron and/or his sons have 100% ownership in. There is no limitation or qualification on "dealerships" as that term is used in the March 2013 Emails. Ron's arguments to the contrary are baseless and should receive no deference.

That Ron is bending over backwards to make unsupported arguments regarding the March 2013 Emails highlights how relevant and significant those emails are. As the Court knows, this case involves Ron's breaches of fiduciary duty, including, but not limited to, the unauthorized and undisclosed related party transactions such as transactions between Columbia and Pond Realty Company (a.k.a. Joseph Management). Like the July 2011 Emails, the March 2013 Emails evidence a plan on the part of Ron's sons to "funnel money" from dealerships in the Joseph Auto Group, which includes Columbia Acura and Columbia Hyundai. To effectuate this plan, Ron and his sons engaged in a series of corporate actions in May of 2013—just two months later—that facially consolidated the power over Columbia in Ron by installing him as sole director of Columbia and its subsidiaries. This had the practical (and Plaintiff contends intended) effect of limiting or removing whatever obstacles remained that could have prevented more money being "funneled" from Columbia to Pond Realty Company, as originally planned by Ron's sons less than two months earlier in the March 2013 Emails. Thus, following May 2013, Ron was able to put

12

into action the plan his sons contemplated in the March 2013 Emails and funnel money to Pond Realty Company (an entity owned by his sons and of which he is both the President and one of two employees) with nothing standing in his way. These communications are directly relevant to Plaintiff's breach of fiduciary claims that are premised on the self-dealing transactions with Pond Realty Company—the same transactions discussed in the March 2013 Emails.

Given the substantial relevance of the March 2013 Emails and the lack of any evidentiary (or logical) basis for Ron's arguments to exclude them, Ron's Motion should be denied.

### VI. Ron's Motion *in Limine* Regarding "Discovery and Shareholder Inspection Disputes"

Ron's next Motion relates to a group of "disputes" regarding discovery in this litigation and Plaintiff's extrajudicial requests to inspect Columbia's corporate records. This subject has been extensively discussed in Plaintiff's Memorandum in Opposition to Defendant Ronald Joseph's Motion for a Separate Trial on Claims for Equitable Relief (Do. No. 164), and that memorandum is incorporated herein by reference.

In sum, Plaintiff has no intention of introducing evidence or otherwise discussing the numerous discovery disputes that have arisen in this litigation. Those disputes are separate and distinct, however, from the extrajudicial records inspection requests that Plaintiff has made, in her capacity as a shareholder of Columbia, both before and during this litigation.

Plaintiff has discussed her various extrajudicial requests to inspect Columbia's corporate records at length in previous filings with the Court. *See*, *e.g.*, Doc. No 120, PAGEID 7923-7933 (detailing Plaintiff's proper shareholder inspection requests and Ron's refusals of same). For all four of those requests, Ron's counsel (at first Joe Rouse of Keating Muething & Klekamp, and then Jim Frooman of Frost Brown Todd) responded on Ron's behalf. Ron ultimately provided very little information in response to those requests.

Just because Ron chose to respond to Plaintiff's extrajudicial shareholder inspection requests through his counsel (including the same counsel that seeks to represent him at trial) does not make those extrajudicial requests "discovery disputes." Nor does the involvement of Ron's counsel automatically require a conclusion that those shareholder requests are somehow related to discovery at all. In fact, Plaintiff's first and most expansive request occurred in October 2015, roughly six months before she initiated this litigation on April 12, 2016. *See* Doc. No. 120-16, PAGEID 8720-8721. Thus, to the extent Ron's Motion seeks to prohibit any discussion of these extrajudicial shareholder requests by characterizing those issue as "discovery disputes," it should be denied.[7] Those requests are not discovery disputes, and Ron's responses to them are examples of the minority shareholder oppression which forms part of the basis for Plaintiff's breach of fiduciary duty claims.[8]

## VII. Ron's Motion *in Limine* Regarding "References to Exhibits That Are Not Admitted"

Ron's Motion seeking to prohibit Plaintiff from making "any references or disclosures to the jury of the contents of any exhibit which has not been admitted into evidence, or which has been excluded from evidence by the Court" must be denied. This is a back door way of preventing Plaintiff from doing what all attorneys do, and what courts allow. That is, show the jury in opening statements documents to help them understand what the case is about.

---

[7] Ron asserts that "Plaintiff has added opposing counsel to her witness list in an apparent attempt to bring her discovery claims before the jury." Doc. No. 152, PAGEID 11042. Such a characterization is an example of how Ron's counsel is blurring the distinction between discovery disputes occurring over the course of this litigation and Plaintiff's legitimate extrajudicial requests to inspect Columbia's records. Ron's counsel are not included on Plaintiff's witness list in order to provide testimony regarding the discovery disputes in this litigation—rather, they are included on Plaintiff's witness list because they have been active participants in the facts underlying Plaintiff's claims.

[8] In *United States v. Skeddle*, Judge Carr listed the failure to disclose the related party transactions as a breach of fiduciary duty. Thus, this evidence is also highly relevant, because Ron not only failed to disclose those transactions voluntarily but also in the face of active efforts by a minority shareholder to gain access to records that would have revealed their existence.

As this Court is aware, the Federal Judicial Center's Manual for Complex Litigation encourages the use of technology in the courtroom, and in particular urges visuals during opening statement. By definition, those exhibits are not yet admitted into evidence at that point. Moreover, the vast majority of the documents Plaintiff intends to use are those produced by Ron, or about the business of the Joseph Auto Group. If Ron has any issue with the documents Plaintiff intends to use in opening statement, he can object at trial—but a motion *in limine* to exclude those documents from being used is inappropriate at this juncture and should be denied.

Ron goes on to contend that "Plaintiff has repeatedly made misleading arguments and statements about the contents of documents, and about documents and evidence that are not admissible—particularly as it relates to the contents of entries from Columbia's general ledger." Doc. No. 152, PAGEID 11042. Ron's lack of specificity regarding Plaintiff's alleged "misleading and arguments and statements" about documents is telling. Indeed, that lack of specificity is itself an independently sufficient basis for denying Ron's Motion on this point.

"[M]otions *in limine* are 'generally confined to **very specific** evidentiary issues of an extremely prejudicial nature.'" *Storrs v. Univ. of Cincinnati*, No. 1:15-CV-136, 2018 WL 684759, at *2 (S.D. Ohio Feb. 2, 2018) (Black, J.) (internal citations omitted) (emphasis added). As this Court stated in *Storrs*, "[i]f the evidence is not plainly inadmissible on all potential grounds, the Court's 'evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context.'" *Id*. (internal citations omitted). Ron tellingly does not cite any examples of (i) what purported "misleading arguments and statements" Plaintiff has made about documents, (ii) what documents Ron unilaterally and baselessly contends are "not admissible," or (iii) what statements Plaintiff has made about Columbia's "general ledgers" that Ron wants to take issue with.

Given the patent lack of specificity of what arguments, statements and documents Ron is referring to, and the prejudicial effect that granting it would have on Plaintiff's ability to make an effective opening argument, Ron's Motion should be denied and the Court should rule at trial on any specific issues Ron may have with any unspecified "arguments" and evidence that the seeks to exclude.

**VIII.   Ron's Motions *in Limine* Regarding "Send a Message" and "Golden Rule" Arguments**

Ron' Motion regarding "Send a Message" arguments likewise suffers from a lack of specificity that makes it impossible for the Court to grant his Motion.  While Plaintiff does not intend to make any "Send a Message" or "Golden Rule" arguments at trial, the scope of Ron's Motions on these issues is unclear.  Ron's Motion should thus be denied and the Court should rule on these issues, if they arise at all, during trial.  *See Storrs v. Univ. of Cincinnati*, No. 1:15-CV-136, 2018 WL 684759, at *2 (S.D. Ohio Feb. 2, 2018) (Black, J.).

**IX.    Ron's Motion *in Limine* Regarding "References to a Party's Wealth or Financial Position"**

In his next Motion, Ron seeks an order from the Court prohibiting Plaintiff from "arguing or making assertions about Defendants' wealth."  Doc. No. 152, PAGEID 11042.  Ron says his Motion on this issue should be granted because such evidence is (i) not relevant, (ii) lacks probative value, and (iii) would "only" confuse and inflame the jury.  *Id*., at PAGEID 11043-11044.  Contrary to Ron's Motion, however, evidence of Ron's and his sons' financial condition is highly relevant and has significant probative value that far outweighs any Rule 403 concerns.  In order for the jury to understand what Ron has been doing, it needs to understand the disparity of economic and other practical power between Ron and Marie.  In the circumstances presented, Ron has huge financial power and no need to receive ordinary course dividends from Columbia that

16

might otherwise be declared by Columbia's board of directors. Perhaps even more significantly, Ron has had control, not only over Columbia itself, but also over other entities to which Columbia pays money or for which Columbia provides services or other things of value, providing him with opportunities to funnel money in which Marie has not shared. In addition, Ron has had the need, from time to time, to use Columbia assets to obtain advantages for himself or his sons in their dealings with third parties involving their other assets and companies that they claim to own. Marie has none of those things. Ron's conduct and Marie's responses to that conduct might appear inexplicable to the jury unless they can see and understand that background and the relative financial strength and circumstances of the parties. Those circumstances have provided the opportunity and the motive for Ron to engage in conduct that will be at issue in the trial.

This case includes claims that Ron, a majority and controlling shareholder of Columbia, has been exercising his control of Columbia to benefit himself and his immediate family at Plaintiff's expense. Ron's financial condition (particularly as compared to Plaintiff's) is direct evidence of the many opportunities that Ron has had and the many benefits Ron has provided to himself that he has *not* provided to Plaintiff. The disparity in Ron's financial condition as compared to Plaintiff's financial condition is thus highly relevant to this case.

Courts have permitted parties to introduce evidence on an opposing party's financial condition for "narrow reasons" such as knowledge or potential motive. *See e.g., Gonzalez Prod. Sys., Inc. v. Martinrea Int'l Inc.*, No. 13-CV-11544, 2015 WL 4934628, at *11 (E.D. Mich. Aug. 18, 2015). This case is one in which there will be multiple albeit "narrow reasons" to make reference to Ron's "wealth or financial position." Because Ron's self-dealing transactions have involved other companies that he claims to own or control separately, references to those companies and the effects of those transactions are inextricably part of Plaintiff's proof. For

17

example, as discussed above, references to Ron's financial position are inherent in providing information to the jury about the context and nature of the self-dealing transactions. Ron's wealth and financial position explain both his opportunity and one of his motives for withholding ordinary dividends from Marie: in vernacular terms, Ron can hold his breath a lot longer than Marie can. Ron's claimed ownership of other companies with which Columbia has done business also demonstrates both opportunity and motive for the self-dealing transactions in which he has engaged.

Given that Ron's financial condition and his other assets are relevant to this case, the Court should provide Plaintiff the opportunity to introduce specific evidence about Ron's wealth and financial position for the narrow purposes of demonstrating to the jury the opportunities, motives, means and results of Ron's oppressive conduct through which Ron has improperly provided himself financial benefits that he has not provided to Plaintiff.[9] Any decisions of the Court about the admissibility of references to Ron's wealth or financial position "should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." *Storrs v. Univ. of Cincinnati*, 2018 WL 684759 at *2. Ron's motion broadly and non-specifically seeking to prohibit any references to his wealth or financial position at trial through a motion *in limine* should therefore be denied.

## X. Ron's Motion *in Limine* Regarding "Joseph Auto Group as a Legal Entity"

Ron's final Motion asks the Court to "exclude any argument or claim by Plaintiff referring to the Joseph Auto Group as a legal entity." Doc. No. 152, PAGEID 11044. Ron's sole basis for this Motion is the Defendants' summary judgment briefing. The Court has already ruled on this issue.

---

[9] Plaintiff does not intend to make arguments at trial regarding Ron's "alleged ability to pay a verdict," the other basis for Ron's Motion on this issue.

First, a motion *in limine* is not the appropriate method for asking the Court to "exclude [an] argument," and Ron's Motion can and should be denied on that basis alone. Second, the Court has ruled on the parties' motions for summary judgment and permitted Plaintiff's claims against Ron regarding Columbia's operation of the Joseph Auto Group to move forward to trial. *See* Doc. Nos. 119 and 120. Given the Court's ruling on this very issue, Ron's Motion regarding the Joseph Auto Group is moot and should thus be denied.

## XI. Conclusion

For the reasons discussed above, all of Ron's Motions should be denied, except for his Motion regarding the opinions and testimony of Michael Costello, which Plaintiff does not contest.

Respectfully submitted,

 */s/ Kevin L. Murphy*
Kevin L. Murphy (#0021810)
J. Jeffrey Landen (#0018174)
MURPHY LANDEN JONES PLLC
2400 Chamber Center Drive, Suite 200
P.O. Box 17534
Fort Mitchell, KY 41017-0534
Telephone: (859) 578-3060
Fax: (859) 578-3061
kmurphy@MLJfirm.com
jlanden@MLJfirm.com
*Counsel for Plaintiff*

## **CERTIFICATE OF SERVICE**

 I certify that on the 5th day of September, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notice to all counsel of record.

             */s/ Kevin L. Murphy*
             Kevin L. Murphy